Okay, the next case before the court, Siler v. EPA. It is an appeal from a decision of the Merit Systems Protection Board. You're going to have to help me with the pronunciation of your name. Is it Bui? Bui. Okay, I guess I got it right. So, Ms. Bui, you want five minutes for rebuttal? May I please the court? I'm sorry, Your Honor, he put 15 minutes on the clock, and I thought I had reserved five minutes for rebuttal. Well, you'll get the yellow light at five minutes. Oh, gotcha. Okay. May I please the court? My name is Molly Bui. I represent the petitioner, Matthew Siler. With me at counsel table is Robert Selden. Mr. Siler is the petitioner in this case, and he was removed from his position as special agent with the Environmental Protection Agency after he made disclosures, protected disclosures, about his former supervisor in the Chicago area office, who was special agent in charge, Ash. Mr. Siler disclosed that he had twice observed Mr. Ash appearing intoxicated while on duty, and he took a photograph of Mr. Ash asleep at his desk, which he distributed to other members of the Chicago office. Let me ask you, you've got several errors that you claim, one of which is this issue relating to the claim of privilege with respect to documents that were not turned over. Yes, Your Honor. How do you believe that the information in those documents could impact the case? Well, so Mr. Siler was first subject to a misconduct investigation by the Office of Inspector General. That OIG report was issued in January of 2015. Six months go by, Mr. Siler's on light duty during that time frame, and he then makes his disclosures in June of 2015 about Mr. Ash. Two weeks later, an administrative investigation, which we refer to in the brief as the PECWA investigation, is initiated. And the document that's at issue was a draft suspension that has Director Parker's name on it. Do I recall correctly, though, that there's more than just one document? There's a draft suspension and a draft removal? There may have been a draft removal, but there were several drafts that were produced with the agency's discovery documents. Some of the draft removal documents... And you saw them all? Yes, Your Honor. Was there a removal one in there? Yes, but I think that some of the draft removals that were produced in discovery were versions of the removal that was ultimately given to Mr. Siler. So what your view of these privileged documents and the emails is that it would allow you to better present the timeline of when these decisions were made, vis-a-vis his whistleblowing? And I can explain because the draft suspension, that's the crux of our argument, it appears to have been based on the OIG report of investigation that was issued in January 2015. It mirrors the facts in the OIG investigation, the charges mirror the OIG investigation, and it logically doesn't make sense that someone would have drafted a proposed suspension based on an OIG investigation if all along they were planning to conduct a secondary administrative investigation in Mr. Siler. But what about the fact that we have a change in decision makers? Can't the new decision maker have the right to look anew at the circumstances? Sure, but Mr. Parker was still at the agency in June of 2015 when Mr. Siler made his protected disclosures. Is it true that those documents, the draft suspension, and even the draft removals are all undated? I think the draft removals are, definitely the draft suspension is undated. What I have been able to deduce from the facts that are included is that that was based on the OIG investigation, not on the administrative investigation. What it looks like is the agency was prepared, or at least contemplating going forward, with a proposed suspension of Mr. Siler based on the OIG investigation right up until he made his protected disclosures in June of 2015, at which point they decided to conduct this administrative investigation. That conflicts with the testimony that was given by EPA managers at the hearing that they had been talking about doing this administrative investigation for six months. And there's also absolutely no documentation of any of these conversations that were supposedly taking place in that time period. I'm looking at the appendix at J1667, and it's talking about the draft notice of proposed suspension that you started talking about. And it says it's from Douglas Parker to Matthew Siler, but it also says there's a notice of proposed removal, and that's also from Douglas Parker to Matthew Siler, right? Same people? I believe that's correct, Your Honor, that there was an undated draft proposed removal that had Mr. Parker's name on it, and there was the undated draft proposed suspension that had Mr. Parker's name on it. But part of our issue with this is that we were given the document, and then the agency claimed that it was privileged, never made any showing of how it was privileged at all. And because we were given these documents immediately before the hearing, and the agency counsel had represented to me during discovery that Mr. Parker was not involved in the disciplinary process against Mr. Siler. So we did not depose Mr. Parker. I didn't call him as a witness at hearing. I didn't propound any interrogatories about Mr. Parker. We were deprived of any opportunity to investigate why his name was on a draft proposed suspension. When was this created? Why was it created? You elected not to call Parker based on what you took as a representation from the counsel, right? Yes, because Mr. Parker is no longer with the federal government. So I would have had to subpoena him. And I approached the agency counsel and said, I haven't seen anything with Mr. Parker's name on it up to this point. The discovery that had been produced did not have Mr. Parker's name on it. So I said, I am asking you, was he involved in the disciplinary process? Is he somebody that I need to be getting the subpoenas? Well, did the government know about these documents at the time that representation was made to you? I assume the government did know about those documents. They've claimed that they're attorney-client privileged. Well, I mean, they dropped out in a sweep, right? They were produced as part of a response to our electronic discovery. In a dump. That's right. But there were only 1,200 documents. This wasn't a 10,000-page document production. It was a very small, limited document. My point where you're going is to say, if you'd known about these documents at the time the government told you that Parker wasn't involved, you might have said, hey, wait a second. I'm not certain I buy that. I want to call him. Absolutely. And even if we had just been given a privilege log that said, because one of the things when this issue about the attorney-client privilege came up, I said, well, can you at least give me the transmitting email? The email, because this document was produced from someone's email account. We know that because it was part of the e-discovery production that was limited to four managers' email accounts. So it had to have come from someone's email. So I said, can I have at least the transmitting email that shows who sent it, who it went to, and the date? If you're claiming the document is privileged, fine, but I want the time information to your point about it being undated and establishing the timeline. And the agency counsel refused to provide the transmitting email, and that prompted the phone call to Chambers with the administrative judge. And also, we weren't given any privilege log, which also would have had the same information about the date, who sent it, who received it, and at least would have set out some colorable basis for the attorney-client privilege. We never received any of that information. All right, let's move on to the car factors. You focus on car factor three and the comparison with Ash, and you argue that the wrong legal standard was employed, right? That's, well, in the sense that the judge gave very limited weight to Mr. Ash being a proper comparator to Mr. Tyler. Right, it seemed to say that they had to be identical, not just similarly situated. That's correct. Even though they had the same deciding official, same proposing official, at least one of the charges was identical, conduct unbecoming. And Mr. Ash had multiple specifications under the charge of conduct unbecoming. The judge said because the type of misconduct that they allegedly participated in was too dissimilar, she gave it very little weight under car factor three. So the focus on the dissimilarity by the ALJ was that one was an outside activity that affected the perception of the public of the agency, and the other was all internal. How do you respond to that? Well, Your Honor, I think that if the public, as they do know now, knew that a supervisor at the EPA Criminal Inspection Division, Criminal Investigation Division, was groping female employees, having sexual intercourse in his office, using vulgar sexually- Mr. Ash should have been more severely punished, but I give this less weight because they're different from one another. I mean, I understand what you're saying about Mr. Ash. Yes. The question here is, I consider one comparator, and I think it deserves less weight. How do we get involved in that? We're supposed to determine, as a legal matter, how much weight should be given to a particular comparator? Well, I think that the precedential decisions of this court, including Whitmore, including Miller v. DOJ, say that, first of all, let's keep in mind, it was the agency's burden at this point. At this point of the process, we're talking about the agency has a burden of showing by clear and convincing evidence that they take the same types of actions against non-whistleblowers that they take against whistleblowers. And the agency absolutely failed to meet that burden, and I feel like that A.J. turned the burden around on us to say, you have to show that Mr. Ash was similarly situated in all these different ways, as opposed to saying to the agency, show me other non-whistleblowers who were investigated for the same types of things that Mr. Seiler was investigated for, who were removed for the same types of things he was investigated for, who were subject to an administrative investigation following an open case. That type of evidence simply was not produced. What about another argument that you made was that under CAR Factor 3, the A.J. should not have considered or given so much weight to the existence of whistleblowers who hadn't, in fact, engaged in any wrongdoing and how they weren't punished. Yes. Why shouldn't that be considered at all, the agency's treatment of similarly situated whistleblowers, even though they aren't similarly situated in that they didn't engage in any misconduct? Well, not only were they not similarly situated in that they didn't engage in misconduct, they weren't similarly situated in terms of their chain of command. That's not true with regard to the initial whistleblower. Ms. Weaver. To focus on her, she's the one who actually blew the whistle. That's correct. Your client is a secondary, he's the secondary for one of the others, right? Yes. And so why is it inappropriate to, and she was not, you know, she blew the whistle, right? She did. She was one of the people who gave testimony about this. And if the agency was going to retaliate against whistleblowers, why wouldn't they retaliate against her? She's the one who started it. Well, our view of that is that Mr. Seiler was in a uniquely vulnerable position. He was already on light duty status. He already had this OIG. And that's for misbehavior. That's, well, but the OIG investigation had cleared him, so to speak. For criminal conduct. That's right, but the OIG is absolutely empowered to investigate administrative misconduct. They do it all the time. But they didn't do it. In this case, they didn't say, we absolve you of criminal conduct as well as of any possible civil misconduct. No, they could, but they were fully empowered, had they wanted to, to investigate those. I'm coming back just for one data point on whether or not Mr. Ash is different from your client. Don't you think the public would recognize the difference between someone who brandishes his firearm against a member of the public to try to intimidate that person? That's what your client did, I think. That is not one of the charges for which my client was removed. No. But the facts show, in terms of asking whether these people are similar, your client, you know, in that episode when he went to get the stuff back, he allowed his gun to be shown to intend to admit that he was trying to intimidate this person. I think that... Isn't there a difference between that conduct and having sex with your own wife in the office? Well, first of all, that's not remotely the limitation of Mr. Ash's misconduct in the office. And his sex in the office with his wife. He also groped several subordinate female agents. You were relying on the sex in the office earlier? As well, I mean, there were eight specifications. Eight specifications in that, which were later repeated, some of them, in a later misconduct. Don't you think the public would find both horrible, be aghast at the conduct of brandishing a gun to try to intimidate somebody, and also someone who has this sexual problem in the office? I need to make a clarification about the brandishing of the gun. That was something that was investigated by the OIG. The OIG found that he had not used his position to intimidate the owner of Wisconsin Tactical... They found the conduct wasn't criminal. That's right. And none of the specifications... But they didn't find it didn't happen. None of the specifications for which Mr. Seiler was removed involved him brandishing his gun to intimidate Mr. Hanash. That was not one of the charges for which Mr. Seiler was removed. So I understand that, to your point about that that's something members of the public might have some concern about, but that was not one of the... The conduct on becoming was threatening a member of the public? In an email. In an email. Not with his gun. Right. And when you're determining similarly situated, it has to be based on what the charges are that... That's correct, Your Honor. Are the basis for removal.  We've gone over your time. I'll give you three minutes for rebuttal. Thank you, Your Honor. All right, counsel. I want to start with the claim of privilege here. I have to say I've never seen a more bogus claim of privilege in my life. I mean, this is... You don't do a privilege log. You produce these documents. You say they're privileged. You don't produce anything to establish that they're privileged. You go back and forth saying, I don't really know who wrote them. Oh, by the way, it might have been somebody in HR. We don't know who they sent them to. How can you possibly base a claim of privilege on those kinds of facts? And Judge, I totally understand where you're coming from. I think one important thing to note is that throughout the drawn out... And I conceived you were not the lawyer who was saying all this stuff. Well, I'm defending... I represent the government here today. Right. And I do want to defend the government's position, which is that during this drawn out discovery process, there was an extremely contentious period of negotiation regarding key terms, custodians. I mean, there was an initial request that was extremely expansive. But can you agree with me there is no showing of privilege upon which a privilege determination could have been made in this case? I think there was an assertion of privilege, and I think during the hearing... I mean, if this came out at a time where the parties had an opportunity to make a decision, it kind of being sprung up at the hearing, I think it could have been better laid out. But at the same time... Well, better laid out. I mean, the ALJ just kept saying, I trust the lawyer who says they're privileged, even though the lawyer said, I don't know who wrote it. I don't know who got it. It might have been HR that wrote it. I mean, there is no finding that can be supported. So let's assume these documents are not privileged. Where do we go from there? I think if you assume the documents are not privileged, I think that's a big assumption that we'll make just for purposes of this hypothetical. Well, tell me how they're privileged then, or tell me how you made a showing of privilege at the time. I think there were two assertions of privilege during written discovery, where the trial attorney below said, look, proposed personnel actions were specifically requested. This was an RFP number 12 petitioner. But how is a lawyer assertion of privilege a sufficient showing of privilege? You have the burden to establish privilege. Right. And so, again, I mean, this goes back to the context of this contentious discovery process, where eventually a week before the hearing, the parties finally negotiated the finalized terms. And that's what led to the production of these documents. Do you think that by the government saying that something's attorney-client privileged, they're saying it was written by an attorney? Is that your position? Because in your appellate brief, I agree with Judge Romelli, I looked at all the record sites on this. And the only thing in there is we don't know who wrote these. We think someone from HR might have written these. And wait, just wait. Okay, sure. On page 55 of your red brief, you say the EPA's counsel during the trial consistently and repeatedly made representations on the record that the working drafts were drafted by attorneys. And then you have all these sites following that. But looking at those sites, there's absolutely nothing in the record saying that these were drafted by attorneys. So the only thing I can figure is that maybe you think that when you say there's an attorney-client privilege, automatically everybody is supposed to assume that that means it was drafted by attorneys, notwithstanding testimony suggesting otherwise. And this is in Appendix 1931. This is in the hearing transcript. The petition does not deny that they got a document listing all the individuals involved in drafting the proposed personal actions. And there's no dispute in this case that that listing of individuals who were involved in drafting those proposed actions, there were attorneys on there. So when the attorney is then responding at the hearing... Now, is that for all possible... That's for all the proposed personal actions. And that was turned over before the hearing. And that was turned over before the proposed personal actions were turned over. Did they list the names? Did they identify them as attorneys and members of the bar? I believe so. Do you believe so or do you know... Because that document is not in the record. Well, then, if it's not in the record, where are you talking about? Because it was mentioned at the hearing. And that's the document where... Another example. Counsel at 1938 said to the A.J., I don't know who wrote those letters and I don't know when they were written. And then later, before that, at 1674, says, we don't know who drafted them. As I suggested, I suspect, well, I'm pretty certain, virtually certain they weren't drafted by Mr. Parker. I suspect they were drafted by somebody in H.R. who assumed that Mr. Parker would be the proposing official. Again, there's no evidence or even fair argument that these were written by an attorney or that they were encompassing privileged information that was discussed between an attorney and the client. And again, I mean, that response is directed to the two specific proposed drafts that were presented to the board judge. It's not talking about the vast, you know, the corpus of proposed personal actions that the government had. It's specifically referring to those two where... And those are the two that she'd like to have access to. Right. And again, I think even if you disagree with this on the privilege issue and you say the board judge abused her discretion in this regard, it's hard to understand how that would... Let me ask you this question. What evidence, not attorney argument, what evidence is there in the record that these two documents were written by a lawyer? Their undated proposed... What evidence, other than attorney argument, okay, in the record, says that these documents were written by a lawyer? There's an implicit concession in Appendix 1931. And that's the closest we have. Concession by who? At the hearing, it's... Concession by who? I'm sorry, I'm just going to turn back to it just to make sure I get it correct, Judge Clevenger. What appendix page are you talking about? I'm looking at 1931, Judge O'Malley. O'Malley? I don't see anything... Who's going to concede that it was written by an attorney? I'm certainly Mrs. Bowie. Judge, I'm having trouble finding it. And if that's a miscite, I apologize. I have to say that on page 55 of your brief, you say that EPA's counsel consistently and repeatedly had representations that the working drafts were drafted by attorneys. And then you have four sites, none of which are JA 1931, and none of which support this assertion. And I've come to expect more from government attorneys. No, Judge, and the first two documents that are referring to are written discovered responses, where the government counsel does, in fact, assert attorney-client privilege. But there's nothing saying that the working drafts were drafted by attorneys. There is absolutely nothing in the record to support that. Right, and I think part of the problem, part of the difficulty here is that there was initial pre-conference hearing, or pre-board hearing, where the judge kind of addressed the issue... But part of the problem here is that you've misrepresented the record. No, Judge, and if, Judge Stoll, if you feel that way, I apologize. That certainly wasn't my intention. In the written discovery responses that the government turned over, saying we are not turning over proposed personal actions, the government counsel specifically made assertions of attorney-client privilege. Now, I think there's a lot here that says... I mean, that's the problem. We've got this pattern. You said attorney-client privilege, but you never, ever produced anything to support that. And, in fact, on the record, repeatedly said things completely inconsistent with that. And then you do the same thing in your briefs. So there's this pattern of, well, we're just going to say it's privilege, and we don't care. Let me ask you once again. Is there any evidence in the record, any evidence in the record, that these two documents we're talking about were written by an attorney? Answer that question, yes or no. No, there's not. There's no evidence. There's no direct evidence of that. So I say in your next case, how can you possibly claim attorney-client privilege for something that could be written by a teenager? You'd be sanctioned. Well, Judge... Wouldn't you if you made an affirmment? And you couldn't back it up? Judge Clevenger, to be absolutely clear here, a few days before the hearing, the board judge said, look, if we're going to talk about the privilege, let's brief it. I know exactly what the timing is. And the district court judge gave Ms. Bowie the fits over the fact that they didn't think she... And she said, I'm sorry, I didn't understand what you were asking from me. There was a misunderstanding here, right? And then the AJ could easily have solved this entire issue on timing and could have written an opinion saying, I'm sorry, Ms. Bowie, you misunderstood. That's your problem. You're too late. It's over. But they expressly ruled in the opinion, I'm not relying on timing. I'm relying on these two documents being shielded by the attorney-client privilege, right? That's what the board judge said, correct. So we're not interested in any argument about timing. No. So how can you possibly stand in front of this court and say that the government wants to cloak these two documents with attorney-client privilege? The sentiment that we're trying to cloak these documents... Confessing error is not a sin. Judge Clevenger... Probably gets you fired, but I mean, it's not a sin. Well, the way these things developed was there was a hearing. No motion followed. I get you say this was contentious, but you still dumped documents on the other side right before the hearing, and then you claimed they were privileged. You didn't produce the e-mails that would show the metadata so you could tell when they were prepared and who they were transmitted between. And now you're saying that it's all their fault? No, Judge O'Malley, I'm not characterizing this as a dump either because I think the board judge said, look, she addressed this at the problems in two motions to compel and said this is both parties' faults. Okay, the way that this developed, you guys should have worked together to kind of narrow this down and come to a compromise. So even the board judge didn't ascribe fault to any which party. But putting fault aside, there's still the burden that's on the agency to prove that they didn't have to produce these materials. And the agency never satisfied that burden. And again, I mean, the documents were raised pre-board hearing. Right, so that board hearing should have been moved. I agree. I mean, if any party had sought a continuance at that point, I'm inclined to think the board judge probably would have granted it. I mean, she already granted one previously. And that was actually due to documents, right? That was a document dispute, and the board judge said, well, okay, I'll grant a continuance. And that could have happened here as well. And I think the issue could have been much better fleshed out provided that the petitioner moved or filed something saying, hey, look, we just got these documents. We want a chance to review them. We have a privileged dispute. And I think the board judge could have addressed it at that point. But given that it was raised at the hearing, and it was kind of sprung up, even on the first day of the hearing, the way the document was presented, there were no physical copies presented to any of the witnesses or the board judge. And it was only at the end of the second day of the hearing where the documents were finally presented to the board judge without any sponsoring witness, where the petitioner asked the board judge to just take them into evidence. Can I ask you about CAR Factor 3? Because I think we might be running out of time. Okay, no, I understand, Judge. So in CAR Factor 3, it's agency action against similarly situated non-whistleblowers, right? Correct. Why is it appropriate under CAR Factor 3, then, to consider whistleblowers? Here, there's a whole paragraph in the AG's opinion where she analyzes whistleblowers and says that this factor, I don't know if she says it weighs against the government, but it weighs in favor of the government. She concluded it weighed in favor of the government. But as part of that analysis, she considered the agency's treatment of whistleblowers. Why would that be appropriate under a factor that is requiring consideration of non-whistleblowers? I don't think we're saying that's appropriate. I think we're saying it's unclear whether you can do it. In fact, I think if... You think it's unclear whether she can say it? I mean, the phrasing of the element would suggest that you shouldn't include other whistleblowers in that analysis. And I think we do mention that in our brief. But she did. She did. And what she did was she took the motive to retaliate, because certainly they'd be relevant to the question of whether there was a motive to retaliate, and then said, look, I'm considering that same evidence for CAR Factor 3, and then said, in the slightest way, I'm going to find that in favor of the agency. So if you want to ratchet... Well, she didn't really say in the slightest way. Well, I do think out of the three... She made a finding that that weighs in favor of the agency. I think if you look at the factors, the third CAR Factor was... She viewed it the least in favor of the agency. She said on page 29, she has a title. It's Treatment of Non-Whistleblowers. And she is addressing that. And then on page 30, she says, finally, this is in the context of considering CAR Factor 3. Finally, and perhaps most tellingly, there is no evidence in the record that the agency retaliated against the first person to report. I mean, this is in the context of considering CAR Factor 3. She's talking about the treatment. I'm sorry, Judge, so which page? Page 30. 30. I mean, I just don't see how you can say that she didn't consider the treatment of whistleblowers in the context of analyzing CAR Factor 3. I'm confused by that answer. Yeah, and is there a place that you can cite me to in the record where she said just slightly weighs in favor of the agency? No, I think if you read the decision, Factor 1 was... But she doesn't say that. You just said a few minutes ago that she said that. Right, and I think if you view the CAR Factors the way she... But she doesn't say that, right? I don't think she uses those precise words, but I think the way she decides the first CAR Factor is she decisively favors the agency on that. The second CAR Factor, she says that's also in favor of the agency based on credibility determinations. The third CAR Factor, I think she comes to the conclusion that, look, I'm evaluating all this evidence, and I find this in favor of the agency as well. And I don't think she had to do that because at the end of the day, even if you ratchet that back, you still have the fact that the strength of the agency's evidence on the CAR Factor was very strong. And the second CAR Factor as well, I mean, that's based on credibility determinations and the weighing of the evidence. And that's not reviewable in this court because those are credibility determinations that the board judge made in support of the agency's personal action. So, you know, with respect to the privilege issue, I mean, I understand the court's, I guess, disappointment in the fact that there's not more in the record regarding what the grounds for the privilege were, but I also think the circumstances contributed to that in the way that discovery kind of developed. A lot of what the petitioners... Okay, you're out of time. Now you're repeating yourself, so we got that. Okay, thank you. All right, thank you, Judge. You're down to only three minutes left. Can I just ask one tiny little fact question? What's a receiver or a receiver kit? That's a good question, Your Honor. I asked the same question of Mr. Seiler and some of the other witnesses. A receiver, I guess, is the main part of the gun of the AK-47, as opposed to the barrel or the stock. That's what it is. And a receiver kit has the pieces that go into that receiver. Yes, and in fact, I believe the pieces were separated amongst a bunch of different boxes. One point I want to make, though, we've been focusing on Mr. Ashe's misconduct as it's relevant to CAR Factor 3. We would also submit that his misconduct, and specifically the agency's handling of his misconduct, overlooking it, allowing it to continue for years and years, is also relevant to CAR Factor 2, which is the agency's motive to retaliate against Mr. Seiler. The judge credited Mr. Barnett's testimony that he would applaud a whistleblower like Mr. Seiler for coming forward with evidence of misconduct. However, that is not certainly what Mr. Barnett did when multiple women came forward and testified, and the OIG or the administrative investigation confirmed that they had been mistreated by Mr. Ashe. Mr. Barnett did not applaud those women. He instead mitigated Mr. Ashe's proposed 30-day suspension to 14 days and allowed Mr. Ashe to remain on as those women's supervisor into perpetuity, the same women that the agency itself confirmed that he had mistreated and groped and behaved boorishly towards. You have a Douglas Factor error issue in your appeal as well. I'm curious to know whether there's any difference, and if so, what, between CAR Factor 3 and the Douglas Factor that examines whether or not there's been disparate treatment for similarly situated individuals? Your Honor, I think that there is a lot of overlap between those two aspects. Are they different? Well, I know that with the CAR element, for example, I mean, the similarly situated language appears in both standards, I believe. But with respect to the CAR aspect, this court has said that the agency, in fact, has the burden of looking throughout the entire agency to show that it treated other people who were non-whistleblowers the same way that it treated Mr. Seiler. It's not limited to the same chain of command. This is the Miller v. DOJ case. This court has said the agency has to show that it does this to other people, and it absolutely didn't do that. The agency had the burden on the CAR factor. Mr. Seiler has the burden on the Douglas Factor, at least to articulate how he was treated dissimilarly. Well, you seem to make an argument at one point that if the government can't come forward with anything on CAR 3, then the government should lose. Well, that was actually the Whitmore decision that said that if an agency cannot produce evidence on CAR Factor 3, that that could lead to them losing on the clear and convincing evidence standard. That's a line from the Whitmore decision, Your Honor. Okay, we're out of time. Thank you.